IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| Plaintiff, | ) ) ) ) | |
| v. | ) ) | No. 12 CR 521-9 |
| Amado Estevez Cancino, | ) ) | |
| Defendant. | ) | |

Memorandum Opinion and Order

In August of 2008, Amado Estevez Cancino was serving a 135-month prison sentence after pleading guilty to a narcotics conspiracy charge in the Eastern District of California when he escaped from prison and fled to Mexico.[1] Cancino—a United States citizen—remained in Mexico for over a decade, where he worked, married, had children, and became a Mexican citizen. He was extradited to the United States on July 26, 2019, pursuant to two separate extradition requests by the United States: one for completion of his sentence in the Eastern District of California,

---

[1] According to Cancino, he had recently discovered that the appeal and habeas corpus petition his family had hired an attorney to pursue on his behalf were never filed. Bereft at the prospect of serving what he believed was an unfairly long sentence given his status as a non-violent, first-time offender, he made the "unfortunate decision to walk away from" the prison camp where he was in custody. Mot. at 1.

and another pursuant to the Second Superseding Indictment in this case, which charges him with nine counts of wire fraud.

In May of 2021, Mr. Cancino filed a motion to dismiss the Second Superseding Indictment on the ground that his prosecution violates his Sixth Amendment right to a speedy trial.[2] Although the record before me paints a troubling picture of threats, hardships, neglect, and occasional violence that Mr. Cancino and his family endured throughout his incarceration in Mexico pending his extradition, I conclude that it does not establish a Sixth Amendment speedy trial violation. Accordingly, his motion is denied.

I.

The charges in this case arise out of Mr. Cancino's alleged participation in a fraudulent scheme to steal money from timeshare owners. The scheme involved convincing the owners that fictitious entities were interested in buying their timeshares and persuading them to pay supposedly reimbursable "fees" associated with the sales transactions. In reality, there were never any buyers, and no timeshare sales were ever completed; the fraudsters simply pocketed the so-called fees and then ghosted their victims.[3] During

---

[2] Mr. Cancino had previously filed a pro se motion asserting a speedy trial violation in March of 2020, but he withdrew that motion in May of that year after I appointed him new counsel. The pending motion was filed by Mr. Cancino's current counsel.
[3] The Merriam-Webster online dictionary defines "ghosting" as: "the act or practice of abruptly cutting off all contact with someone

2

a consensual interview with FBI agents upon his return to the United States in July of 2019,[4] Mr. Cancino provided information about the charged scheme. Gov't. Resp., Exh. F (Cancino Interview).

The United States first began extradition proceedings against Mr. Cancino long before these events, however, when it submitted, in September of 2009, a "Request for Provisional Detention" for purposes of international extradition through treaty-based diplomatic channels. *See* Mot., Exh. I (Department of Foreign Affairs Memo) at 1. Although the record is unclear as to where Mr. Cancino was living at that time, he had been arrested by Mexican authorities earlier that year in Tijuana and charged with possession of counterfeit documents.[5] Thereafter, Mr. Cancino and his wife moved successively to the cities of León, Zapopan, Hermosilla, and Ensenada. Mr. Cancino was arrested in Ensenada on March 8, 2018, pursuant to the government's extradition request seeking his return for the completion of his drug sentence.

---

(such as a former romantic partner) by no longer accepting or responding to phone calls, instant messages, etc." *See* https://www.merriam-webster.com/dictionary/ghosting (last accessed September 30, 2021).

[4] I have reviewed the video recording of this interview and note that the agents informed Mr. Cancino of his *Miranda* rights prior to questioning.

[5] A State Department document captioned "ACS Activity Log" and attached to Mr. Cancino's motion notes that Cancino was "released from custody and deported [to the United States] on February 19, 2009." Mot., Exh. A at 2. Neither the government nor Mr. Cancino addresses this notation, and all appear to agree that Mr. Cancino remained in Mexico consistently from at least February of 2009 to July 26, 2019.

In the meantime, on August 11, 2015, a grand jury in this district returned the Second Superseding Indictment naming Mr. Cancino as a defendant in this case. The same day, the United States Office of International Affairs ("OIA") received an extradition request for the fugitive Mr. Cancino, Gov't. Resp., Exh. D (Warner Decl.) at ¶ 16. The following day, a warrant was issued for Mr. Cancino's arrest, DN 442, and was entered into the National Crime Information Center ("NCIC"), Gov't Resp., Exh. E. Over the next several months, OIA worked with the United States Attorney's Office for the Northern District of Illinois to review, finalize, and translate the voluminous extradition materials, which were sent to the Department of State on April 21, 2016. Gov't. Resp., Exh. D (Warner Decl.) at ¶¶ 17-19. The State Department then conducted its own review and certification of the extradition materials, and on June 3, 2016, sent a cable to the United States Embassy in Mexico to request a "diplomatic note" for the extradition package. *Id*. at ¶ 20. On October 13, 2016, the U.S. Embassy formally presented the extradition package to the Mexican authorities. *Id*. The government states that OIA periodically sought and received updates about the status of the extradition package, and that Mexican authorities informed OIA in approximately February and November of 2017 that the package was in the hands of the Mexican Attorney General. *Id*. at ¶ 21.

As noted above, Mexican authorities arrested Mr. Cancino on March 8, 2018, pursuant to the extradition request arising out of his conviction in the Eastern District of California.[6] While in custody, on June 4, 2018, he was "arrested" pursuant to the government's second extradition request arising out of this case. Thereafter, the two extradition requests proceeded essentially in tandem: Mexico granted the first request—which Mr. Cancino affirmatively told both Mexican judicial authorities and United States consular officials that he did not contest[7]—on June 12, 2018. It granted the second request on July 16, 2018. The first extradition agreement became final on August 29, 2018, and Mr. Cancino was made available to the office of the Mexican Attorney General for his surrender to the United States. At that point, however, the Mexican Attorney General's office indicated that it could not surrender Mr. Cancino until the second extradition agreement became final. Mexico informed the OIA on or around August 6, 2018, that although the second extradition request had been granted, defendant had the right to appeal. Gov't. Resp., Exh. 5

---

[6] Unless otherwise noted, the events summarized in this paragraph are taken from Exhibit I to Mr. Cancino's motion, which is a memorandum the Mexican Department of Foreign Affairs provided to the United States Embassy in response to the latter's request for "a timeline of the extradition process of Mr. AMADO ESTEVEZ JR., ... also known as AMADO ESTEVEZ CANCINO...". DN 617-9.

[7] See Mot., Exhs. I at 2 and N (notes from 5/16/18 visit by Vice Consul Matt Priest) ("Working on extradition. He is not fighting it, thinks it's progressing quickly.").

5

(Warner Decl. at ¶ 23). In a subsequent communication dated September 18, 2018, and received by the United States Embassy on September 20, 2018, Mexico informed the United States that as Mr. Cancino had not filed an appeal within thirty days of July 30, 2018 (the date he was notified that extradition had been granted), the decision had become final. Mot., Exh. U (Diplomatic Note ASJ-33910). At that point, Mr. Cancino had been in custody in Mexico pursuant to the two United States extradition requests for approximately four-and-a-half months.

This is where things get messy. All appear to agree that under the extradition treaty between the United States and Mexico, as well as under Mexico's International Extradition Law, the United States was required to take custody of Mr. Cancino within sixty days after its second extradition agreement became final. *See* Mot., Exh. I (Department of Foreign Affairs Memo) at 4 (referring to "the 60-calendar-day term...for the United States government to take the defendant"). In Mr. Cancino's view, the second extradition agreement became final on August 29, 2018—thirty days after he was notified of the agreement on July 30, 2018—so the sixty-day window expired on October 28, 2018. The United States did not take custody of him by that date. According to the United States (and, as explained below, the Mexican courts), the sixty-day window did not open until the United States received Diplomatic Note ASJ-33910 informing it of the decision's finality and of Mr. Cancino's

availability for surrender. That occurred on September 20, 2018. *See* Mot., Exh. at 8, ¶ 11 (Spanish text referring to the United State Embassy's receipt of Diplomatic Note ASJ-33910 on September 20, 2018). By the government's count, this means that the sixty-day window was open until November 19, 2018. The United States did not take custody of Mr. Cancino by that date either.

Based on his erroneous belief that the United States had failed to take custody of him within the allowable time period, on October 30, 2018, Mr. Cancino filed a "Writ of *Amparo*" under Mexican law "against those seeking enforcement of the extradition agreements dated June 12 and July 16 of 2018." Mot., Exh. I at 4. This action resulted in an immediate stay of execution of the extradition agreements. *Id*. The *amparo* complaint alleged among other claims that his confinement pursuant to the extradition requests beyond October 28, 2018, violated Mexico's International Extradition Law. *See* Mot., Exh. W. at 1, 9 (quoting, in Spanish, Article 35 of Mexico's *Ley de Extradición*).[8] The *amparo* court

---

[8] The quoted text reads: "*Cuando el Estado solicitante deje pasar el término de sesenta días naturales desde el día siguiente en que el reclamado quede a su disposición sin hacerse cargo de él, éste recobrará su libertad y no podrá volver a ser detenido ni entregado al propio Estado, por el mismo delito que motivó la solicitud de extradición.*" Paraphrased in English, this Article provides that if the country seeking extradition does not take custody of the requested individual within sixty days following the day after the individual is made available to the requesting country, the individual must be released and may not be detained again or surrendered to the requesting country for the same crime that gave rise to the extradition request.

denied Mr. Cancino's complaint on March 29, 2019. Mot., Exh. I at 5, W. Mr. Cancino appealed that decision, which was affirmed on June 27, 2019. The decision of the appellate court, which "definitively denied the requested *amparo*," was reported to the Mexican Department of Foreign Affairs on July 9, 2019. Under Mexican law, that decision restarted the sixty-day window for the United States to take custody of Mr. Cancino, which it did shortly thereafter, on July 26, 2019. *Id*.

## II.

Mr. Cancino asserts four arguments in support of his speedy trial claim: 1) that the United States government failed to make sufficient efforts to locate him in Mexico after his indictment in this case; 2) that the government's failure to coordinate its two extradition requests caused an unnecessary delay in the proceedings and a lengthy period of incarceration in inhumane conditions in Mexico; 3) that the government failed to pursue alternative avenues to obtain custody of him promptly when it knew that he was not contesting his extradition; and 4) that the government's failure to communicate with him regarding the finality of his extradition proceedings "invited" him to pursue *amparo* proceedings that further delayed his return to the United States. None of these arguments finds traction in either the record or the law.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. This means that the government "has a constitutional duty to make a diligent, good faith effort to bring a defendant to trial promptly." *United States v. Mitchell*, 957 F.2d 465, 468 (7th Cir. 1992) (citing *Smith v. Hooey*, 393 U.S. 374, 383 (1969)). In *Barker v. Wingo*, 407 U.S. 514 (1972), the Supreme Court identified four factors to consider in determining whether the Sixth Amendment's speedy trial guarantee has been violated: "(1) the length of delay between the defendant's indictment and trial, (2) the reason for the delay, (3) the timeliness of the defendant's assertion of right, and (4) the prejudice the defendant suffered due to the delay." *Id*. Observing that the multifactor *Barker* test lacks "crispness," the Seventh Circuit has offered "a usable compressed version" of the standard that goes like this: "the longer the delay and the more vigorous the defendant's demand to be tried speedily, the more reason the state must show for the delay and the less harm (of whatever type) to himself the defendant need show." *Leora v. United States*, 714 F.3d 1025, 1031 (7th Cir. 2013).

A defendant's constitutional speedy trial right "is triggered by an arrest, indictment, or some other official accusation." *United States v. Arceo*, 535 F.3d 679, 684 (7th Cir. 2008). In this case, the Second Superseding Indictment triggered Mr. Cancino's

9

speedy trial right, and all agree that the nearly four years that elapsed between its issuance in August 2015 and Mr. Cancino's initial appearance in July of 2019 was long enough to be presumptively prejudicial. But "[d]ifferent weights should be given to different reasons for delay," *id.*, and the record suggests that the delay in this case was largely of Mr. Cancino's own doing.

Mr. Cancino insists that he was not in hiding after fleeing from a federal prison camp in 2008, that he used his own name and "correct address" in official Mexican documents, and that the government could easily have found him. Setting aside the factual rub in this argument—the identity document Mr. Cancino points to lists an address in Zapopan, Jalisco, yet by the time the Second Superseding Indictment issued, he was living over 1,400 miles away in Ensenada, Baja California; and he admitted that he tried to avoid detection by law enforcement because of his legal troubles in the United States[9]—Mr. Cancino offers no authority to suggest that the government had a constitutional duty to take any measures to find him in Mexico beyond its invocation of the treaty-based

---

[9] *See*, e.g., Gov't. Resp., Exh. F (FBI Interview), at 16 ("I have a beef in the U.S. And I'm, like, you know, I can't go for help."); 92–93 (FBI Special Agent Adam Nevens: Did you ever, uh, report them to the authorities? CANCINO: See, that's the thing. H-, how?... [T]here's nothing I could tell, because, uh, you know, I was on the run. You know, I didn't wanta bring it to the authorities…. So as for me calling the authorities, I mean, what, they're not gonna believe me…. I'm gonna get arrested, and my wife and my kid stay in Mexico."); 101 ("I can't turn myself in.").

extradition procedures. *See United States v. Demirtas*, 204 F. Supp. 3d 158, 171 (D.D.C. 2016) ("If the United States has a valid extradition treaty in place with a foreign country and prosecutors formally seek extradition ..., courts routinely hold that the government has satisfied its diligence obligation.") (ellipses in original, internal quotation marks and citations omitted). And the government pursued that avenue with diligence.

Nor is there merit to Mr. Cancino's argument that the government's "failure to coordinate" its two extradition requests resulted in any material delay in his extradition. His assertion that the "direct result" of a lack of coordination between prosecutors in this district and in the Eastern District of California "was that Cancino was required to spend a nightmarish seventeen months in Mexican jails" simply is not borne out by the record. As the timeline summarized above lays out, the first extradition agreement became final on August 29, 2018, and the second became final less than a month later, on September 20, 2018. Accordingly, even assuming, as Mr. Cancino asserts, that "a simple records check" would have alerted prosecutors in this district that another extradition request for the same individual was in the pipeline—although the fact that he was prosecuted under different names in the two jurisdictions attenuates this

11

argument[10]—it appears that coordination between the two offices would have made, at most, only a modest difference in the time Mr. Cancino spent in Mexican jails. The bulk of the seventeen months Mr. Cancino spent in custody in Mexico was the result of his own actions—specifically, the pursuit of his *amparo* action.

Mr. Cancino faults the government for his misunderstanding about when the extradition agreement stemming from this case became final. While his assumption that the second extradition agreement would become final on August 29, 2018, i.e., thirty days after he was notified of the agreement on July 30, 2018, was perhaps reasonable, it was nevertheless determined to be erroneous under the Mexican laws he asserted in his counseled *amparo* complaint. *See generally* Mot., Exh. W. Further, it was his Mexican attorney's obligation—not the United States government's—to explain to him how the filing of the *amparo* action would affect his extradition proceedings. Nothing in his submission offers any reason to conclude otherwise.

Finally, Mr. Cancino argues that because he did not oppose his extradition and indicated that he wished to return to the United States as soon as possible, the government was required to

---

[10] The case caption in the Eastern District of California names "Amado Estevez, Jr." while this case identifies him as "Amado Estevez Cancino." That both names may be correct, as Mr. Cancino explains, does not change the fact that it makes identifying him as the same individual more difficult.

12

pursue some alternative to extradition to expedite his repatriation.[11] But the only authority he cites for that proposition—*United States v. McConahy*, 505 F.2d 770, 773 (7th Cir. 1974)—does not support it. In *McConahy*, the government argued—and the court assumed—that the federal charges against the defendant, who was then serving a sentence in England for crimes prosecuted by the British government, were for non-extraditable offenses. The court observed that the fact that the United States was unable invoke treaty-based extradition procedures did not prevent it from requesting his return to the United States through other means. Nothing about the court's decision suggests that where treaty-based extradition procedures are available, the United States can or should eschew them in favor of some alternative procedure.

The foregoing discussion reveals the significant flaws in Mr. Cancino's four major arguments in support of his speedy trial claim. In *Barker* terms, it shows that although the length of delay favors Mr. Cancino, the reason for the delay overwhelmingly favors the government. And the remaining *Barker* factors—timely assertion of the right to a speedy trial and prejudice to Mr. Cancino—point in the same direction.

---

[11] It is true, as the government observes, that Mr. Cancino told FBI investigators during his July 2019 interview that he was "fighting" his extradition while in Mexico. Gov't Resp., Exh. F at 37 ("I'm fighting my extradition. I might, you know beat it."). But that account does not comport with the record, which supports his current description of events.

13

Mr. Cancino's assertion of his right to a speedy trial can hardly be characterized as "vigorous." *See Leora* 714 F.3d at 1031 ("the more vigorous the defendant's demand to be tried speedily," the greater the government's burden to justify the delay). To the contrary, Mr. Cancino told FBI investigators immediately upon his return to the United States that he intended to plead guilty, *see* Gov't Exh. F, at 26, and he has never sought a trial. Moreover, since his initial appearance, he has acquiesced to multiple continuances without objection to the exclusion of time, and he requested to terminate representation by his first appointed attorney, prompting additional delays in the proceedings. Mr. Cancino presumably determined that these steps were in his best penal interest, yet they are not the hallmarks of a defendant "impatient for a trial." *Leora*, 714 F.3d at 1032.

This leaves the question of prejudice. The record contains ample evidence substantiating Mr. Cancino's account of his harrowing experience in Mexican prisons, and "oppressive pretrial incarceration" is indeed among the sorts of harm that courts consider "prejudice" in this context. *Doggett v. United States*, 505 U.S. 647, 654 (1992). But even accepting that Mr. Cancino suffered prejudice as a result of his seventeen-month incarceration in Mexico, that does not tip the scales in his favor when considered in light of the remaining *Barker* considerations, i.e., Mr. Cancino's own responsibility for the delay and his

14

failure timely to assert his speedy trial rights. Moreover, it bears recalling that Mr. Cancino would have been detained in Mexico regardless of his indictment in this case, since his arrest in March of 2018 was pursuant to the government's extradition request in conjunction with his drug sentence. And while he faults the government's handling of the successive extradition requests for prolonging his custody, his argument in this connection does not survive scrutiny for the reasons explained above.

III.

For the foregoing reasons, the motion to dismiss is denied.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: October 1, 2021